UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TOMMY E. PHELPS,                              Case No. 1:13-cv-321
        Plaintiff,                           Spiegel, J.
                                             Litkovitz, M.J.
        vs.

COMMISSIONER OF                              REPORT AND
SOCIAL SECURITY,                             RECOMMENDATION
        Defendant.

        Plaintiff brings this action pro se pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for

judicial review of the final decision of the Commissioner of Social Security (Commissioner)

denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security

income (SSI).   This matter is before the Court on plaintiff's Statement of Errors (Doc. 10) and

the Commissioner's response in opposition (Doc. 14).

I.  **Procedural Background**

        Plaintiff filed applications for DIB and SSI in April 2008, alleging disability since March

1, 2006, due to high blood pressure, bad knees and hip, right shoulder injury, heart attack, carpel

tunnel in right hand, diabetes, depression, and two kidney stones.   (Tr. 306).   Plaintiff's

applications were denied initially and upon reconsideration.   Plaintiff, through counsel,

requested and was granted a de novo hearing before administrative law judge (ALJ) Gregory G.

Kenyon.   Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing.   On

November 16, 2011, the ALJ issued a decision denying plaintiff's DIB and SSI applications.

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ

the final administrative decision of the Commissioner.

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.   42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).   The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.   42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)).   The claimant has the burden of proof at the first four steps of the sequential evaluation process.   *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).   Once the claimant establishes a prima facie case by showing an inability to perform the

2

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] met the insured status requirements of the Social Security Act through March 31, 2011.

2. The [plaintiff] has not engaged in substantial gainful activity since March 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: right shoulder strain, obesity, diabetes mellitus, coronary artery disease, hypertension, history of kidney stones, and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: (1) occasional crouching, crawling, stooping, kneeling, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no concentrated exposure to temperature extremes or excess humidity; (4) no concentrated exposure to respiratory irritants such as smoke, fumes, dust, noxious gasses or odors, or poorly ventilated spaces; (5) no exposure to hazards such as unprotected heights or dangerous machinery; (6) occasional overhead reaching with the right upper extremity; (7) unskilled, simple, repetitive tasks; (8) occasional contact with co-workers, supervisors, and the public; (9) no rapid production pace work or work involving strict production quotas; and (10) limited to jobs which involve very little, if any, change in the job duties or work setting from one day to the next.

3

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1965 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from March 1, 2006, through the date of this decision (20 CFR 404.1520(g)) and 416.920(g)).

(Tr. 13-24).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1] Plaintiff's past relevant work was as a machine operator and yard laborer.  (Tr. 23).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 8,000 unskilled, light jobs in the local economy and 1,134,000 unskilled, light jobs in the national economy such as small products assembler/bench assembler, inspector, and packing line worker.  (Tr. 24).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Statement of Errors

The medical findings and opinions of record have been adequately summarized in the ALJ's decision (Tr. 16-21) and will not be repeated here. Where applicable, the Court will identify the medical evidence relevant to its decision.

5

In his pro se Statement of Errors, plaintiff argues that he is entitled to disability benefits because he has a number of medical impairments and accompanying symptoms which preclude him from working. (Doc. 10). Plaintiff alleges that he has had five stents implanted, he takes heart medicine and medication for his high blood pressure, and the nitroglycerin he takes causes side effects which include bad headaches, weakness, and lowered blood pressure. Plaintiff also alleges that he suffers from chronic kidney stones. Plaintiff states that he experiences uncontrollable sweating at times, he gets dizzy and weak, he cannot tolerate heat, he becomes dehydrated, he has to use the bathroom "a lot," he is having problems with his right arm currently, and he has "[n]erve problems." (*Id*.).

In response, the Commissioner argues that the ALJ's decision that plaintiff is not disabled as a result of his physical impairments is supported by substantial evidence showing that plaintiff's cardiac impairment has been successfully treated and plaintiff's treating cardiologist has explained that the biggest impediment to plaintiff's cardiac health is his lifestyle. (Doc. 14 at 5-6). The Commissioner contends that the medical records do not support plaintiff's allegations of side effects from his medications. (*Id*. at 6-7). The Commissioner further argues that while the evidence shows plaintiff has suffered from kidney stones and has been treated for this medical impairment, no medical source has assessed any functional limitations as a result of this condition. (*Id*. at 7). In addition, the Commissioner contends that the ALJ accommodated any restrictions that may be imposed as a result of plaintiff's right shoulder impairment, and plaintiff's counsel conceded at the hearing that it is possible that plaintiff's complaints of right arm pain are not supported by objective evidence. (*Id*. at 7-8). Further, the Commissioner notes that several medical reports state that plaintiff denied experiencing night sweats, dizziness and

6

weakness, and there is no evidence showing that plaintiff's high blood pressure, dizziness, weakness, dehydration or bouts of uncontrolled sweating interfered with plaintiff's ability to perform work-related activities. (*Id.* at 8-9). Finally, the Commissioner contends that plaintiff does not challenge the ALJ's findings concerning his mental impairment, and plaintiff has therefore waived consideration of any issues related to his mental limitations.[3] (*Id.* at 5, n.1).

### E. The ALJ's decision is supported by substantial evidence.

Because plaintiff is proceeding pro se and does not identify any specific errors committed by the ALJ, the Court has carefully reviewed the ALJ's decision to determine whether the ALJ's pertinent findings of fact were made in compliance with the applicable law and whether substantial evidence supports the ALJ's decision. *See Troth v. Commissioner of Social Sec.*, No. 3:11-cv-272, 2012 WL 1185999, at *2 (S.D. Ohio April 9, 2012) (Black, J.) ("Because Plaintiff is proceeding pro se, the Court has carefully reviewed the ALJ's decision to determine whether his critical findings of fact were made in compliance with the applicable law and whether substantial evidence supports those findings."). *See also Angel v. Commissioner of Social Sec.*, No. 1:06-cv-857, 2008 WL 2795803, at *13 (S.D. Ohio July 16, 2008) (Spiegel, J.) (same). After a careful review of the record, the Court determines that the decision of the ALJ is supported by substantial evidence and should be affirmed.

The record substantially supports the ALJ's finding that plaintiff suffers from severe impairments of right shoulder strain, obesity, diabetes mellitus, coronary artery disease,

---

[3] Plaintiff simply states "Nerve problems" in the Statement of Errors. (Doc. 10 at 2). It is not clear whether this is a reference to a problem with his right arm or an alleged mental impairment because plaintiff does not make any assertions pertaining to alleged nerve problems or to any other mental impairment in the Statement of Errors. Nonetheless, the Court has examined the medical evidence related to plaintiff's severe mental impairment and mental functional limitations and finds for the reasons discussed below that the ALJ's findings related to plaintiff's mental limitations are substantially supported by the record.

hypertension, history of kidney stones, and depression. (Tr. 13). Further, upon a thorough

review of the treatment records and the medical opinions and assessments, the Court finds that

the ALJ's RFC finding for a restricted range of light work with a number of non-exertional

restrictions in supported by substantial evidence.

At the hearing before the ALJ, where plaintiff was represented by counsel, counsel argued

that plaintiff's coronary artery disease and hypertension posed the greatest difficulties for

plaintiff, although counsel acknowledged that plaintiff's hypertension seemed to be under better

control. (Tr. 37). Counsel stated that plaintiff also suffers from "chronic unrelenting kidney

stones," noting that plaintiff had been to the hospital for kidney stones in December 2008, June

2010, July 2010 (seven visits), August 2010 (two visits), September 2010 (two visits), October

2010 (once for stent removal and once for flank pain), and February 2011. (Tr. 37-38). Plaintiff

testified that he had not engaged in any work activity since March 2006, the date of alleged

disability onset. (Tr. 39-40). Plaintiff testified that he is unable to work because he is

chronically fatigued and his arm and hand would swell if he had to use them repetitively, though

he testified he has no difficulty reaching overhead. (Tr. 44, 50). Plaintiff testified that he had a

myocardial infarction in April 2008, and he had cardiac stents implanted at that time and again in

October 2008. (Tr. 40). Plaintiff testified that since that time he gets short of breath three to four

times a month both with and without exertion. (Tr. 41-42). Plaintiff also testified that he takes

nitroglycerin for chest pain, which occurs once or twice a month with exertion, and the

nitroglycerin provides relief but causes a bad headache which subsides after one hour. (Tr. 43,

51). He testified that he goes to the hospital when his kidney stones flare up, which occurs every

three to four months. (Tr. 46). Plaintiff testified that he has difficulty urinating because of the

8

kidney stones. (Tr. 45). He testified that he must use the bathroom 15 to 20 times a day when the kidney stones are active. (Tr. 53-54). Plaintiff testified that he could lift 10 to 15 pounds, though not constantly; he could stand 15 to 30 minutes before becoming fatigued; and he could sit 30 minutes at a time because it is normal to have to get up and stretch. (Tr. 47). Plaintiff testified that he smokes 10 cigarettes daily. (Tr. 49). Plaintiff testified that his health care providers have told him to walk and he tries to walk the dog daily for 20 to 25 minutes, but he gets fatigued. (Tr. 49, 50). Plaintiff testified that he can dress, shower, and help with the household chores, although his mother does most of the chores. (Tr. 48). Plaintiff testified that he is depressed and moody and he has difficulty concentrating and remembering things, but he is not seeing a psychologist because he has no insurance. (Tr. 45).

No treating physician has offered an opinion as to the functional limitations imposed by plaintiff's impairments. However, the record includes a number of assessments provided by examining and non-examining sources. Under the Social Security regulations, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 402 (1971)). The regulations further provide that "[s]tate agency medical and psychological consultants . . . are highly qualified physicians [and] psychologists . . . who are also experts in Social Security disability evaluation," and whose findings and opinions the ALJ "must consider . . . as opinion evidence." *Id.* (citing 20 C.F.R. § 404.1527(e)(2)(i)). The opinion of a non-treating but examining source is generally entitled to more weight than the opinion of a non-examining source. *Ealy v. Commissioner of*

*Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)[4]; *Smith v.*

*Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). A non-treating source's opinion is

weighed based on the medical specialty of the source, how well-supported by evidence the

opinion is, how consistent the opinion is with the record as a whole, and other factors which tend

to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Wilson*,

378 F.3d at 544. Because a non-examining source has no examining or treating relationship with

the claimant, the weight to be afforded the opinion of a non-examining source depends on the

degree to which the source provides supporting explanations for his opinions and the degree to

which his opinion considers all of the pertinent evidence in the record, including the opinions of

treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

In determining that plaintiff has the physical functional capacity to perform a restricted

range of light work, the ALJ relied on assessments provided by two consultative examining

physicians: Dr. Richard T. Sheridan, M.D., who performed a consultative physical examination

of plaintiff in March 2007 in connection with a previous application filed by plaintiff (Tr. 408-

421)[5] and Dr. Jennifer Wischer-Bailey, M.D., who performed a consultative physical

examination in August 2008 (Tr. 527-38). (Tr. 22). The ALJ also relied on the physical RFC

assessments of two state agency reviewing physicians, Dr. Jeffrey Vasiloff, M.D., and Dr. Ronald

Cantor, M.D., which were issued in September 2008 and March 2009, respectively (Tr. 541-48,

751-58). (Tr. 22). These medical opinions substantially support the ALJ's RFC finding for a

---

[4] Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion that were previously found at §§ 404.1527(d), 416.927(d) are now found at §§ 404.1527(c), 416.927(c).

[5] Plaintiff previously filed applications for SSI and DIB on February 6, 2007, for "sprains and strains-all types," which were denied on May 31, 2007. (Tr. 89-92, 97-102). He apparently did not seek reconsideration of the initial determination denying his applications.

restricted range of light work.

Dr. Sheridan performed an independent medical examination of plaintiff in connection with plaintiff's prior applications for disability benefits. (Tr. 408-421). He reported that plaintiff's chief complaints were right buttock, knee and shoulder pain. (Tr. 412). Dr. Sheridan diagnosed plaintiff with chronic right shoulder strain with impingement, chronic right gluteal strain, and chronic right knee strain. (Tr. 418). He opined that plaintiff was able to lift/push/pull 10 to 20 pounds frequently and 20 to 50 pounds infrequently; perform occasional climbing; occasionally use the right upper extremity overhead; and occasionally squat, crouch, crawl, kneel, reach from the floor to the waist, rotate at the waist, and bend. (*Id.*). The ALJ incorporated most of these restrictions into the RFC except for occasional bending or rotating at the waist, as the ALJ found no evidence of a significant back condition. (Tr. 22).

Dr. Wischer-Bailey examined plaintiff in August 2008. (Tr. 527-38). Her examination took place several months after plaintiff had presented to the hospital in April 2008 with the acute onset of chest pain and had undergone cardiac stent implantation. (*See* Tr. 433-473, 716-49). She diagnosed plaintiff with exogenous obesity, history of myocardial infarction and ongoing angina, hypertension, noninsulin dependent diabetes mellitus, diffuse joint pain, history of drug abuse in remission, and tobacco abuse with a normal respiratory examination. (Tr. 533-34). She reported that plaintiff stated he was unable to work due to shortness of breath and chest pain. (Tr. 534). She noted that plaintiff continued to smoke despite his respiratory complaints and that complete cessation of smoking would obviously be beneficial. (*Id.*). Examination of his heart and lungs was normal on that date. (*Id.*). She reported that her physical examination of plaintiff was "unremarkable." (*Id.*). She reported that plaintiff ambulated with a normal gait; he

11

could forward bend without difficulty; range of motion of all extremities was completely normal; there was no evidence of active synovitis; he likely had mild degenerative joint disease and generalized deconditioning; he had uncontrolled hypertension on examination; and he continued to have ongoing angina symptoms. (*Id.*). Dr. Wischer-Bailey opined that plaintiff appeared capable of performing a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, and pulling, but he should avoid lifting and carrying heavy objects due to his ongoing angina symptoms. She found that plaintiff had no difficulty reaching, grasping and handling objects. Dr. Wischer-Bailey opined that plaintiff would "do best in a dust-free environment." (*Id.*).

State agency physician Dr. Vasiloff reviewed the record in September 2008. (Tr. 541-48). He assessed plaintiff as able to lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; climb ramps/stairs and stoop, kneel, crouch and crawl occasionally; never climb ladders/ropes/scaffolds; avoid concentrated exposure to temperature extremes and humidity; and avoid all exposure to fumes, odors, dusts, gases and poor ventilation. Dr. Vasiloff set forth the medical findings that supported his assessment and concluded that plaintiff "has stable angina and should do no more than light work." (Tr. 543).

State agency physician Dr. Cantor reviewed the record in March 2009, which included additional evidence related to plaintiff's hospitalization in October 2008 for stent placements and an emergency room visit in December 2008 for kidney stones. (Tr. 751-58). Dr. Cantor imposed the same functional limitations assessed by Dr. Vasiloff. Dr. Cantor found plaintiff's allegations regarding the severity of his symptoms and his functional limitations to be only partially

12

consistent with the evidence, noting that contrary to plaintiff's representations that he had been advised by his doctors that he could not work or lift, plaintiff's treating source had reported at plaintiff's most recent cardiac examination that plaintiff was not doing much in the way of exercise, he had gained weight, he continued to smoke, and he could pursue activity as tolerated as he had a disease that inactivity only makes worse. (Tr. 756).

The medical opinions of the examining and reviewing physicians are consistent with the medical records of plaintiff's treating providers. Plaintiff began treating with Dr. Roger Chang, M.D., on June 27, 2006 for high blood pressure and shoulder issues. He denied chest pain or trouble breathing. Plaintiff reported at that time that his blood pressure had been more stable lately, and he denied dizziness or swelling. Plaintiff reported smoking a pack of cigarettes a day. He reported right shoulder pain with lifting. Dr. Chang assessed hypertension, rotator cuff tendonitis, probable allergic rhinitis, and probable obstructive sleep apnea. Dr. Chang noted that plaintiff would be applying for a medical card. He continued plaintiff on Lotrel and Lasix and gave him a hand out on shoulder exercises. (Tr. 395-96).

Plaintiff treated with Dr. Joel Forman, M.D., and Mr. Joseph Barone, CNP, at Ohio Heart & Vascular Center from the time of his cardiac stent placement in April 2008 through at least March 2011. (Tr. 474-85, 495-506, 539-40, 660-73, 958-62). When seen by Mr. Barone on April 23, 2008, following his initial stent placement (*see* Tr. 433-73, 716-749), plaintiff reported no shortness of breath, palpitations, syncope, chest tightness or chest pain. (Tr. 476-77). Mr. Barone reported that plaintiff was trying to stop smoking by using a nicotine patch and was in the process of changing his diet. (Tr. 476). When seen by Mr. Barone for follow up on May 21, 2008, plaintiff reported intermittent chest discomfort at rest and occasionally with exercise. (Tr.

13

474). Plaintiff reported that he was unable to afford to buy the medication Lotrel, and Mr.

Barone indicated he would fill out a medication assistance form and he gave plaintiff samples of

Plavix. (*Id*.). Mr. Barone assessed plaintiff as symptomatically stable. He noted plaintiff was

walking about 15 to 30 minutes a day and was tolerating this well. (*Id*.). Mr. Barone further

noted that plaintiff continued to smoke as he apparently obtained cigarettes for free, but efforts

were being made to place him on Chantix (a smoking cessation medication) through the

assistance program. (*Id*.). In June 2008, plaintiff reported to Mr. Barone that he was walking

most days of the week but for less than 30 minutes, and he did not have any problems with chest

pain or shortness of breath. (Tr. 495-96). Plaintiff was taking his medications without

difficulty. Plaintiff was still smoking but was willing to start Chantix, and he was counseled on

the importance of this. His hypertension was suboptimally controlled, and he was prescribed a

medication which was on the $4.00 program. Plaintiff was "counseled extensively about

generally taking charge of his own health" and encouraged to increase his exercise duration to at

least 30 minutes. (Tr. 495).

On October 10, 2008, plaintiff was admitted to the hospital for chest pain complaints and

underwent a coronary angiography, left ventriculography, left cardiac catheterization,

percutaneous coronary intervention of 90% proximal right coronary and 70% distal right

coronary with stents, and a 99% diffuse in-stent restenosis of previously placed bare-metal stents.

(Tr. 551-635). When seen by Mr. Barone for follow up on October 20, 2008, plaintiff reported

he did not have continuing angina symptoms. (Tr. 663). Mr. Barone reported that plaintiff's

inability to afford medications and continued smoking may have contributed to the restenosis of

plaintiff's stents. (Tr. 664). He advised plaintiff that they would work to make sure he

14

obtained his medication, gave him samples, and told him to call if he was low on medications.
He indicated they were working on a drug assistance program. Mr. Barone counseled plaintiff
on the importance of smoking cessation and an exercise program that consisted of walking and
gradually building up to five times a week and 30 minutes. (*Id.*).

> Plaintiff was seen for follow-up on February 2, 2009, by Dr. Forman, who reported:
>
> He did have an episode of arm pain, which was concerning for his angina several
> weeks ago. This responded to 1 sublingual nitroglycerin. He has not had any
> further problems with chest pain. He unfortunately continues to smoke though
> this became worse when he was off Chantix therapy and he has restarted this. He
> is not doing much in the way of exercise. It is also notable that he is 14 pounds
> heavier than when he first came to our attention in April 2008. He is taking his
> medications without difficulty and is apparently able to afford things for now with
> the help of assistance programs and samples. There is no orthopnea, PND, lower
> extremity edema, claudication, syncope, or presyncope. Electrocardiogram
> continues to show normal sinus rhythm with nonspecific ST-T changes.

(Tr. 660). In his assessment, Dr. Forman noted: "He is apparently applying for Social Security
disability, though I informed him that he can pursue activity as tolerated and that in fact, he has a
disease that inactivity makes worse." (Tr. 661). Dr. Forman advised plaintiff that if he had
further problems with chest discomfort, stress testing should be considered and plaintiff should
call him. (*Id.*). Plaintiff was counseled regarding the importance of smoking cessation and on
the importance of weight loss in connection with his obesity and hypertension, which was
suboptimally controlled, and a hypertension medication was added. Dr. Forman suggested that
plaintiff "reinitiate an exercise program with goal minimum of 5 times per week for at least 30
minutes in duration." (*Id.*). Plaintiff was to have lab work done and follow up with Mr. Barone
in six months. (Tr. 661).

In his most recent follow up report dated March 8, 2011, Dr. Forman stated that plaintiff
had not experienced any chest pain but had only "occasional skipped beat type palpitations

concerning for PVCs, but nothing prolong or associated with syncope or presyncope." (Tr. 960).
Dr. Forman reported that plaintiff continued to smoke cigarettes, though he had cut back because
he was obtaining cigarettes less frequently. (Tr. 960). He was still having difficulty obtaining
branded medications and was on Pravachol therapy for his lipids, which he was apparently able
to afford; he was taking aspirin, Lisinopril, and Carvedilol regularly; and he was taking Plavix on
an intermittent basis when he could get samples. Dr. Forman noted: "It is recalled that he
refused to enroll in assistance program as his household members were unwilling to give the
financial information for this." (*Id*.). Plaintiff stated that he walked the dog or did something
physical on a near-daily basis. Dr. Forman described plaintiff as obese at six feet tall and 227
pounds. (*Id*.). Dr. Forman stated that plaintiff was "without anginal symptoms and on
reasonable secondary preventive therapy. He was informed his lifestyle is his biggest
impediment to his cardiovascular health currently." (*Id*.). Dr. Forman noted that plaintiff's
hypertension was controlled; he discussed the importance of weight loss, diet and exercise with
plaintiff; he counseled plaintiff on the importance of smoking cessation, advising him that while
he was smoking almost sporadically, every cigarette put him at risk and his goal should be to be
off tobacco completely; and he gave plaintiff exercise guidelines. (Tr. 960-61). The plan was
for plaintiff to return for an office visit with Dr. Forman in one year. (Tr. 961).

In addition to his cardiac issues, plaintiff has presented to the emergency room on several
occasions for flank pain and has been treated with pain medication for kidney stones. Plaintiff
was treated with pain medication for a non-obstructive kidney stone in December 2008 (Tr.
639-57, 679-702) and he also presented multiple times to the emergency room between June
2010 and October 2010 for flank pain. (Tr. 762-82, 794-99, 801-87, 911-30, 932-35, 947-57).

16

Tests showed stable non-obstructing kidney stones and a left uretral stone for which plaintiff was treated, including by placement of a stent which was later removed due to complaints of pain. (Tr. 836-37, 884-87). However, no examining or treating physician imposed any functional limitations or assessed any physical restrictions in connection with plaintiff's kidney stones.

These treatment records do not substantiate plaintiff's claims of debilitating shortness of breath, chest pain, or other symptoms. Plaintiff's treating sources did not impose any restrictions on plaintiff's work activities and, in fact, encouraged him to exercise, remain active, and take charge of his own health. The treatment records and treating sources' findings are consistent with and support the assessments and opinions issued by the examining and reviewing physicians of records. The medical evidence as a whole, together with the reviewing and examining physicians' medical assessments and opinions regarding plaintiff's physical impairments and functional limitations, substantially support the ALJ's decision that plaintiff is capable of performing a restricted range of light work.

Further, the Court finds that the ALJ's mental RFC finding is substantially supported by the record. The ALJ included the following non-exertional limitations in the RFC finding to account for plaintiff's mental impairment: ". . . (7) unskilled, simple, repetitive tasks; (8) occasional contact with co-workers, supervisors, and the public; (9) no rapid production pace work or work involving strict production quotas; and (10) limited to jobs which involve very little, if any, change in the job duties or work setting from one day to the next." (Tr. 15). The ALJ's mental RFC finding is supported by the assessment of the consultative examining psychologist, Dr. Nancy Schmidtgoessling, Ph.D., which the ALJ gave "great weight." (Tr. 22, citing Tr. 486-94). Dr. Nancy Schmidtgoessling evaluated plaintiff on June 5, 2008. (Tr. 22,

17

citing Tr. 486-94). Dr. Schmidtgoessling reported that plaintiff had no history of mental health

treatment, but he stated he had been depressed "forever." (Tr. 487). He described his symptoms

of depression as, "I don't like being around people." (*Id*.). Dr. Schmidtgoessling reported that

plaintiff did not show signs of depression or mania during the session. (Tr. 489). Overall, Dr.

Schmidtgoessling estimated plaintiff as functioning in the borderline range of intelligence. (Tr.

490). Dr. Schmidtgoessling's suggested diagnoses included mood disorder

NOS and a Global Assessment of Functioning (GAF) score of 58.[6] (Tr. 491). Dr.

Schmidtgoessling opined that plaintiff was not impaired in his ability to understand and follow

multi-step job instructions. (*Id*.). She assessed plaintiff as mildly impaired in the ability to

maintain attention to simple or multi-step repetitive tasks; moderately limited in his ability to

relate to co-workers and supervisors, mildly impaired in the ability to withstand the stress and

pressure of day-to-day work activity if he is working alone; and moderately impaired in this area

if working around others because he becomes "defiant to expectations." (*Id*.). Dr.

Schmidtgoessling's assessment provides substantial support for the ALJ's mental RFC finding.

　　　For these reasons, the ALJ's physical and mental RFC findings and his conclusion that

plaintiff is not disabled are substantially supported by the evidence of record. Although plaintiff

has a number of severe impairments, the evidence does not show that these impairments impose

greater functional limitations than those included in the ALJ's RFC finding or are disabling. *See*

*Lee*, 529 F. App'x at 713 ("not every diagnosable impairment is necessarily disabling") (citing

---

[6] "GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological
functioning." *Konecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). A GAF score of 51 to 60
indicates "moderate" symptoms " (e.g., moderate difficulty in social, occupational, or school functioning (e.g., few
friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.
2000).

18

*Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) ("[t]he mere diagnosis of [an impairment] . . .

says nothing about the severity of the condition"). The ALJ's decision finding plaintiff is not

disabled should be affirmed.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be **CLOSED** on the

docket of the Court.

Date: 7/11/14

Karen L. Litkovitz
United States Magistrate Judge

19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TOMMY E. PHELPS,                              Case No. 1:13-cv-321
        Plaintiff,                           Spiegel, J.
                                             Litkovitz, M.J.
        vs.


COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.   If the

Report and Recommendation is based in whole or in part upon matters occurring on the record at

an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or

such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless

the assigned District Judge otherwise directs.   A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Tommy E. Phelps
4655 Clayton Dr.
Cinti, OH 45244

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  ☑ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered      ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7011 3500 0001 5345 5888

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540